724 F.2d 413
 14 Fed. R. Evid. Serv. 1715
 Marion K. SEIDMAN, Individually, Plaintiff,
and
David M. Rogers, as Administrator for the Estate of Richard
Scott Seidman, deceased, Appellant,
v.
FISHBURNE-HUDGINS EDUCATIONAL FOUNDATION, INC., t/a The
Fishburne Military School, Appellee.
 No. 82-1865.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 13, 1983.
Decided Jan. 6, 1984.
 
 Barry A. Stiefel, Alexandria, Va. (Wayne M. Mansulla, Washington, D.C., Ashcraft & Gerel, Alexandria, Va., on brief), for appellant.
 Susan E. Greenlief, Arlington, Va. (Robert L. Ellis, Siciliano, Ellis, Sheridan & Dyer, Fairfax, Va., on brief), for appellee.
 Before MURNAGHAN, SPROUSE and ERVIN, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 This appeal involves a wrongful death action arising from the tragic suicide of a cadet at a private military school. Marion K. Seidman, the mother of the deceased cadet, Richard Seidman, and David M. Rogers, the administrator of his estate, brought a diversity action against Fishburne-Hudgins Educational Foundation, Inc., t/a The Fishburne Military School. Seidman and Rogers appeal from a judgment for Fishburne entered after a jury verdict absolving the school of liability. They contend that the trial court should have excluded testimony about a conversation between Mrs. Seidman and a religious minister because it was privileged; that the court erred in refusing to give proffered instructions pertaining to the duty of care owed by the school; and that it committed prejudicial error in commenting on the evidence. We affirm.
 
 
 2
 Richard Seidman was a sixteen-year-old cadet in his second year of studies at Fishburne. Late in the fall semester of 1979, Richard strapped a home-made explosive device to his chest and threatened suicide. Fishburne officials were successful in restraining Richard and immediately sent him to the school infirmary to await instructions from his mother. After the incident, school officials discovered a .22 caliber rifle, which had been a gift from his mother, a shotgun, and ammunition in Richard's room. They placed the weapons and ammunition in locked cabinets in the school's storage facility. The school's policy permits the cadets to keep weapons in the storage facility, but restricts their use to supervised hunting trips and target shooting.
 
 
 3
 Richard was transferred from the school infirmary to a Maryland hospital at his mother's direction. Soon afterwards, he was moved again to the Psychiatric Institute in Washington, D.C., where he received extensive treatment. His condition improved sufficiently by the summer of 1980 that arrangements were made for his re-enrollment at Fishburne for the following September. The only condition placed on his re-enrollment was that he continue to receive psychiatric care while in school. Richard was discharged from the Psychiatric Institute on August 8, 1980, and arrived at Fishburne on September 6, accompanied by his mother. He was to register the following day. When Richard and his mother appeared for registration, they were taken to the office of the Commander of Cadets. The Commander informed them that Richard and a friend had been observed by a school instructor smoking marijuana the previous evening in a dormitory room. Richard was questioned concerning the incident and then told that he would not be permitted to re-enroll. His friend was also expelled because of the marijuana incident.
 
 
 4
 After the interview with the Commander, Mrs. Seidman told Richard to gather his belongings, and they returned to their hotel. Shortly after arriving, Richard informed his mother that he had left personal items at the school. He returned there without his mother and requested his weapons from the sergeant in charge of the storeroom. They were released to Richard, who died shortly thereafter of a self-inflicted bullet wound to the head.
 
 
 5
 Mrs. Seidman sued the school, alleging that Fishburne officials had acted negligently in three respects: (1) they had failed to exercise reasonable care in planning for the readmission of a student with Richard's special problems; (2) they had negligently handled the marijuana incident; and (3) they had failed to exercise reasonable care in releasing the firearms to Richard. The jury found for Fishburne on all three claims.
 
 
 6
 A central issue before the jury was the contributory or intervening negligence of Richard's sister in allegedly giving him the marijuana involved in the smoking incident. The evidence concerning the alleged gift of marijuana first appeared in the deposition of an Episcopalian priest. The priest had been at the hospital near the school when Mrs. Seidman brought Richard there after the shooting. As he was leaving, he was approached by a nurse asking him to stay with Mrs. Seidman until a local rabbi could be found. There was difficulty finding a rabbi, and the priest talked with and consoled Mrs. Seidman for about two hours. It was during this conversation that Mrs. Seidman told the priest that her daughter had given Richard the marijuana.
 
 
 7
 Mrs. Seidman contends on appeal that her disclosures to the priest enjoyed the protection of the priest-penitent privilege. She argues that, under Virginia law, the district court erred in allowing the deposition of the priest to be read into evidence and in allowing Fishburne to use the privileged communication in cross-examining her.
 
 
 8
 Section 8.01-400 of the Code of Virginia (1977 & Supp.1983) establishes the priest-penitent communication privilege for civil cases.[1]
 
 
 9
 No regular minister, priest, rabbi or accredited practitioner over the age of eighteen years, of any religious organization or denomination usually referred to as a church, shall be required in giving testimony as a witness in any civil action to disclose any information communicated to him in a confidential manner, properly entrusted to him in his professional capacity and necessary to enable him to discharge the functions of his office according to the usual course of his practice or discipline, wherein such person so communicating such information about himself or another is seeking spiritual counsel and advice ....
 
 
 10
 Although this statute has not been interpreted by the Virginia Supreme Court in any reported case, we agree with the district court that the plain meaning of the statute grants the privilege only to the minister, priest or rabbi, not to the penitent or lay communicant.
 
 
 11
 The priest-penitent or clergyman-communicant privilege has no firm foundation in common law. See 8 Wigmore, Evidence Sec. 2394 (McNaughton rev. 1961). The privilege, in modern practice, traces its existence to state statute or, in very rare cases, to state decisional law, id. Sec. 2395, and is generally acknowledged to offer very narrow protection to the claiming witness. See, e.g., Reese, Confidential Communications to the Clergy, 24 Ohio St.L.J. 1 (1963). Statutes creating the privilege vary, but generally are designed to safeguard the clergyman's status as a secure repository for the confessant's confidences. Id. Most penitent-priest statutes have a common feature: they explicitly prohibit the clergyman from disclosing the contents of a confidential communication "without the consent of the person making the communication," Ore.Evid.Code, Rule 506 (1981); In re Williams, 269 N.C. 68, 152 S.E.2d 317, 324 (1967); see also Reese, Confidential Communications to the Clergy, supra. Significantly, the Virginia statute contains no such prohibition; it simply says that "no regular minister, priest, rabbi or accredited practitioner ... shall be required to disclose any information" entrusted to him in a confidential conversation. This language plainly invests the priest with the privilege and leaves it to his conscience to decide when disclosure is appropriate.[2] The priest in the present case did not invoke the privilege, but testified freely in a pretrial deposition about his conversation with Mrs. Seidman. Since the privilege was his alone to claim, Mrs. Seidman has no standing to object to the introduction of the priest's deposition into evidence or its use during cross-examination.
 
 
 12
 Seidman next contends that the district court erred in permitting Fishburne to amend its complaint at trial to incorporate the defense theory of contributory negligence.[3] Fishburne requested leave to amend after evidence was introduced showing a possibility that the decedent's sister had contributed to the tragic suicide by giving marijuana to her brother. Seidman argues that the request should have been denied because of a Virginia rule specifying that "[c]ontributory negligence shall not constitute a defense unless pleaded or shown by the plaintiff's evidence." Rules of the Supreme Court, 3:16(d). She contends that this rule creates substantive law which supersedes the liberal amendment provisions of Federal Rule of Civil Procedure 15(b).[4]
 
 
 13
 Rule 3:16, read in conjunction with Rule 1:8 of the Virginia Supreme Court Rules, specifies when the defense of contributory negligence may be raised. For the purpose of determining if the Federal Rules of Civil Procedure apply, the Virginia rules are clearly procedural. Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). See also Yarber v. Allstate Insurance Co., 674 F.2d 232 (4th Cir.1982). "When a situation is covered by one of the Federal Rules ... the [district] court has been instructed to apply the Federal Rule, and can refuse to do so only if ... [the Supreme] Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions." Hanna, 380 U.S. at 471, 85 S.Ct. at 1144. The constitutionally valid federal rule must be given effect in district court, even if it would supply a different result than would state law. Id.; see also Walker v. Armco Steel Corp., 446 U.S. 740, 747-48, 100 S.Ct. 1978, 1983-84, 64 L.Ed.2d 659 (1980). The trial court's decision was a proper exercise of its discretion under Rule 15(b) and therefore Mrs. Seidman's challenge to the amendment must fail.
 
 
 14
 Seidman next argues that the trial judge erred in his jury charge by unduly emphasizing the defendant's theories of intervening cause and contributory negligence, without giving the same attention to her theories of liability. A trial judge in the federal system has wide latitude to assist juries by explaining, summarizing, and commenting on the evidence. See, e.g., United States v. Tello, 707 F.2d 85 (4th Cir.1983). He is not an idle observer of the proceedings, "but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). The dual interests of fairness and impartiality, of course, place natural limitations on judicial comment. The judge must be circumspect in his comments and avoid favoring one party over another. See Pullman Co. v. Hall, 46 F.2d 399, 404 (4th Cir.1931); see also Tello, supra. "In charging the jury [however] the trial judge is not limited to instructions of an abstract sort." Quercia, 289 U.S. at 469, 53 S.Ct. at 699. He may draw the jury's attention to the parts of the evidence he considers important. The trial judge may even "express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination." Id. His comments must be balanced and impartial, but he is not required to divide the time and emphasis given to each side's theories with mathematical precision.
 
 
 15
 The trial judge in this case concededly discussed Fishburne's defense theories in more detail than Seidman's liability theories, but we perceive no partiality in his comments. He never gave his personal views on the believability of the defendant's theories. He was careful to note that "they [Fishburne] say" Seidman's son was treated like any other cadet and that "they say" no reason existed to foresee the son would take his life. He immediately followed this general discussion of the defense theories with a plainly stated admonition that "you [the jury] have to weigh that along with other evidence in the case and make an independent determination." The trial judge carefully explained that, for the defendants to prevail on their affirmative defenses, those defenses must be proven by a preponderance of the evidence. He then identified the requisite elements of a successful contributory negligence defense.
 
 
 16
 Significantly, the trial judge balanced his general description of Fishburne's defense theories with an exposition of the plaintiff's major theory of liability:
 
 
 17
 I tell you as a matter of law young Seidman and his mother were at Fishburne for purposes of enrolling him as a student. They had a perfect right to be there, and they were invitees of Fishburne for purposes of enrolling, or whatever they had gone there for. Now, that imposes certain duties on a host who calls someone to come on their premises. And in this case it was the duty of the defendant Fishburne Military School in operating its school to exercise ordinary care for the benefit of its students in the following areas: One, to adopt and publish rules concerning its code of conduct; two, to call infractions of its rules to the attention of the violator in a reasonable manner; and three, if it accepted a student with special problems, after being informed of the problems, to take reasonable steps to cope with the problems. (emphasis added)
 
 
 18
 Taken together, the court's expressions endorsed neither the plaintiffs' nor the defendant's legal theories or evidence, but were substantially impartial.
 
 
 19
 Finally, Seidman argues that the trial judge's refusal to give four proffered instructions on the degree of care owed by Fishburne to the decedent was error. We disagree. These instructions were directed principally to one of the central issues in the case: whether Fishburne owed a high degree of care in releasing the rifle and whether its action in turning over the weapon to the decedent was reasonable under the circumstances. The trial court dealt with this key issue in two ways. It first instructed the jury as to Fishburne's duty of care in its general relationship with students:
 
 
 20
 [I]n this case it was the duty of the defendant Fishburne Military School in operating its school to exercise ordinary care for the benefit of its students in the following areas: One, to adopt and publish rules concerning its code of conduct; two, to call infractions of its rules to the attention of the violator in a reasonable manner; and three, if it accepted a student with special problems, after being informed of the problems, to take reasonable steps to cope with the problems.
 
 
 21
 It later instructed more specifically concerning the events surrounding the return of the weapon and the applicable standard the jury must apply:
 
 
 22
 Now, there has been evidence in the case that the decedent had certain property that was in the defendant's custody, and at some point in time after the decedent's connection with the school ended, that this property had to be returned. And there is no question that it was the decedent's property, and he was entitled to get it back at some point in time. I tell you, however, that it is up to you to decide whether the manner in which it was done here was reasonable under the circumstances.
 
 
 23
 You have heard a great deal of conflicting testimony about the normal manner that they use for returning guns and ammunition to students, and that since it is in conflict you have to make that decision for yourself. (emphasis added)
 
 
 24
 The reasonable or ordinary care standard is not a static concept in Virginia law. The Virginia Supreme Court made this plain in Perlin v. Chappell, 198 Va. 861, 96 S.E.2d 805, 808 (1957):
 
 
 25
 " 'Reasonable care' or 'ordinary care' is a relative term, and varies with the nature and character of the situation to which it is applied. The amount or degree of diligence and caution which is necessary to constitute reasonable or ordinary care depends upon the circumstances and the particular surroundings of each specific case. The test is that degree of care which an ordinarily prudent person would exercise under the same or similar circumstances to avoid injury to another." Montgomery Ward & Co. v. Young, 195 Va. 671, 673, 79 S.E.2d 858, 859 (further cites omitted).
 
 
 26
 See, e.g., Sturman v. Johnson, 209 Va. 227, 163 S.E.2d 170, 176 (1968) (automobile accident); Colonial Stores, Inc. v. Pulley, 203 Va. 535, 125 S.E.2d 188, 190 (1962) (invitee on land); Daughtery v. Hippchen, 175 Va. 62, 7 S.E.2d 119, 120 (1940) (explosives).
 
 
 27
 In its charge to the jury, the court emphasized that Fishburne's acceptance of a student with special problems created a corresponding duty "to take reasonable steps to cope with the problems." The court instructed the jury that the reasonableness of Fishburne's conduct in releasing the rifle was to be judged from the circumstances, thus making it aware that the evidence bearing on the school's procedures, its knowledge of the student's mental condition and age, and the school's actual conduct were all relevant to the issue of liability. Its charge fairly and adequately presented the applicable law. See, e.g., Mercer v. Burnette, 662 F.2d 706, 708 (11th Cir.1981); Carruba v. Transit Casualty Co., 443 F.2d 260, 264 (6th Cir.1971); see also Wiles v. Nationwide Life Insurance Co., 334 F.2d 296, 300 (4th Cir.1964).
 
 
 28
 Accordingly, the judgment of the district court is affirmed.
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 When the substantive decision in a case is governed by state law, the state law also determines the privilege of a witness. Fed.R.Evid. 501
 
 
 [2]
 This interpretation of the priest-penitent statute is further buttressed by referring to other provisions of the Virginia Code relating to testimonial privileges. The physician-patient privilege is described in Section 8.01-399:
 Except at the request of, or with the consent of, the patient, no duly licensed practitioner of any branch of the healing arts shall be required to testify in any civil action, respecting any information which he may have acquired in attending, examining or treating the patient ....
 Va.Code Sec. 8.01-399 (1977 & Supp.1983) (emphasis added).
 The psychologist-client privilege is described in Section 8.01-400.2:
 Except at the request of or with the consent of the client, no licensed professional counsel, ... licensed clinical social worker, or licensed psychologist ... shall be required in giving testimony as a witness in a civil action to disclose any information communicated to him in a confidential manner ....
 Va.Code Sec. 8.01-400.2 (1977 & Supp.1983) (emphasis added).
 The Virginia legislature included provisions in these statutes which allow communicants to require testimony concerning confidential disclosures to doctors or psychologists. The Legislature's omission of a similar provision from the priest-penitent statute strongly indicates that the clergyman's privilege cannot be affected by the communicant.
 
 
 [3]
 Fishburne had asserted the defense of contributory negligence against the decedent's mother in its pleadings. It had not, however, asserted a similar defense against the decedent's sister
 
 
 [4]
 Rule 15(b) of the Federal Rules of Civil Procedure provides in pertinent part:
 (b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment .... [T]he court may allow the pleadings to be amended and shall do so freely ....
 The State of Virginia has adopted a similar approach to amending pleadings in Rule 1:8 of the Rules of the Supreme Court:
 No amendments shall be made to any pleading after it is filed save by leave of court. Leave to amend shall be liberally granted in furtherance of the ends of justice.
 In granting leave to amend the court may make such provision for notice thereof and opportunity to make response as the court may deem reasonable and proper.